Local Social, Inc. v. Stallings, 2017 NCBC 92.

STATE OF NORTH CAROLINA

WAKE COUNTY

LOCAL SOCIAL, INC. and LYNELL
I. EADDY,

                Plaintiffs,

v.

SEAN STALLINGS,

                Defendant.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
17 CVS 1889

**ORDER AND OPINION ON
DEFENDANT'S MOTION TO COMPEL
ARBITRATION AND PLAINTIFFS'
MOTION TO DISMISS
COUNTERCLAIMS**

1.     **THIS MATTER** is before the Court on Defendant's Motion to Stay Proceedings and Compel Arbitration (the "Motion to Compel Arbitration") and Plaintiffs' Joint Motion to Dismiss Counterclaims (the "Motion to Dismiss") (collectively, the "Motions"). Having considered the Motions, the briefs, and the arguments of counsel at a hearing on the Motions, the Court **GRANTS in part** and **DENIES in part** the Motion to Compel Arbitration and **DEFERS** ruling on the Motion to Dismiss.

> *Ward and Smith, P.A., by Gary J. Rickner and Marla S. Bowman, for Plaintiff Local Social, Inc.*
>
> *Ellis & Winters LLP, by Kelly M. Dagger, for Plaintiff Lynell I. Eaddy.*
>
> *Adams, Howell, Sizemore & Lenfestey, P.A., by Ryan J. Adams, for Defendant.*

Robinson, Judge.

## I.    INTRODUCTION

2.    This litigation arises out of a number of disputes between Plaintiff Lynell I. Eaddy ("Eaddy") and Defendant Sean Stallings ("Stallings" or "Defendant"). Eaddy and Stallings are directors and equal shareholders of Plaintiff Local Social, Inc. ("Local Social"). The claims and counterclaims in this action arise in part out of various agreements among the parties, some of which include an arbitration provision and some of which do not. Three of the agreements pertain to Eaddy's sale of an ownership interest in Local Social to Stallings. Eaddy sold a fifty percent interest in Local Social to Stallings pursuant to a stock purchase agreement (the "Stock Purchase Agreement"). The purchase price of the stock was paid by the execution and delivery by Stallings of a promissory note (the "Promissory Note") made payable to Eaddy, which was secured by a security interest in the sold stock as provided by a security agreement (the "Security Agreement"). At some point after Stallings became a shareholder, the relationship between Eaddy and Stallings deteriorated and, as a result, the parties engaged in arbitration. The arbitration ultimately yielded three additional agreements: an Agreement of Shareholders (the "Shareholders' Agreement"), an Exit Plan and Agreement (the "Exit Agreement"), and Amended and Restated Bylaws (the "Bylaws"). Nevertheless, Plaintiffs contend that, following the execution of these three later agreements, Stallings engaged in an array of misconduct, which led Plaintiffs to remove Stallings as president, terminate his employment, and initiate this litigation seeking monetary and equitable relief.

## II. PROCEDURAL HISTORY

3.     The Court sets forth here only those portions of the procedural history that are relevant to its determination of the Motions.

4.     Plaintiffs initiated this action on February 16, 2017 by filing their Verified Complaint (the "Complaint").  (ECF No. 1.)

5.     This action was designated as a mandatory complex business case by order of the Chief Justice of the Supreme Court of North Carolina dated February 16, 2017, (ECF No. 3), and assigned to the undersigned by order of Chief Business Court Judge James L. Gale dated February 17, 2017, (ECF No. 4).

6.     On April 24, 2017, Defendant filed his Answer and Counterclaims.  (ECF No. 8.)

7.     On May 11, 2017, Defendant filed the Motion to Compel Arbitration.  (ECF No. 10.)

8.     On May 24, 2017, Plaintiffs filed their replies to Defendant's counterclaims, (ECF Nos. 13–14), and their Motion to Dismiss, (ECF No. 15).

9.     Following initial briefing on the Motions, on July 17, 2017, the Court held a hearing on the Motions.

10.     On July 31, 2017, the Court entered an order directing the parties to submit supplemental briefing on: (1) the applicability of the Federal Arbitration Act ("FAA") to the various agreements at issue; (2) which state's substantive laws applies to the agreements; and (3) whether the Court or the arbitrator is to decide issues of substantive arbitrability.  (ECF No. 30.)

11. Plaintiffs and Defendant filed their supplemental briefs on August 18, 2017. (ECF Nos. 32−33.)

12. The Motions have been fully briefed and are now ripe for resolution. The Court makes the following findings of fact and conclusions of law for the sole purpose of deciding the Motion to Compel Arbitration, *Terrell v. Kernersville Chrysler Dodge, LLC*, 798 S.E.2d 412, 416 (N.C. Ct. App. 2017), and not for purposes of determining the Motion to Dismiss.

## III.  FINDINGS OF FACT

### A.  <u>The Parties</u>

13. Local Social is a Delaware corporation with its principal place of business in Wake County, North Carolina. (Verified Compl. ¶ 1, ECF No. 1 ["Compl."].)

14. Eaddy and Stallings formed Local Social in 2009. (Compl. ¶ 8; Aff. Sean Stallings ¶ 5, ECF No. 11.) Eaddy and Stallings are directors and the sole shareholders of Local Social, each owning a fifty percent interest. (Compl. ¶¶ 8−9; Answer & Countercls. 2, ¶ 9, ECF No. 8; Aff. Stallings ¶ 2.) Eaddy is the president of Local Social. (Compl. ¶ 9; Answer & Countercls. 2, ¶ 9.) Stallings was an officer and employee of Local Social until November 11, 2016. (Compl. ¶ 9; Answer & Countercls. 2, ¶ 9.)

### B.  <u>The Stock Purchase Agreement</u>

15. On June 30, 2014, Eaddy and Stallings entered into the Stock Purchase Agreement pursuant to which Eaddy sold fifty shares of Local Social stock, constituting a fifty percent ownership interest, to Stallings for $125,000. (Aff.

Stallings ¶ 7.) The Stock Purchase Agreement states that the purchase price was to be paid pursuant to a promissory note. (Aff. Stallings Ex. A, § 1.2.) The Stock Purchase Agreement contains an arbitration provision and a Delaware choice of law clause. (Aff. Stallings Ex. A, § 8.8(a)−(b).)

**C.  The Promissory Note**

16. Stallings executed the Promissory Note dated August 15, 2014 in the amount of $125,000 made payable to Eaddy. (Compl. ¶ 12, Ex. A; Aff. Stallings ¶ 10.) The Promissory Note provides that it is secured by the Security Agreement, also dated August 15, 2014, covering fifty shares of Local Social stock in Stallings's name. (Compl. Ex. A, at 2.) The Promissory Note contains a North Carolina choice of law clause. (Compl. Ex. A, at 3.) The Promissory Note does not contain an arbitration provision. (Compl. Ex. A.)

**D.  The Security Agreement**

17. Stallings executed the Security Agreement granting Eaddy a security interest in Stallings's fifty shares of Local Social stock. (Compl. ¶ 17, Ex. B.) The Security Agreement contains a North Carolina choice of law clause. (Compl. Ex. B, at 4.) The Security Agreement does not contain an arbitration provision. (Compl. Ex. B.)

**E.  The Shareholders' Agreement, Exit Agreement, and Bylaws**

18. Eaddy and Stallings were engaged in a romantic relationship from 2009 until sometime in 2014. (Compl. ¶ 10; Answer & Countercls. 2, ¶ 10.) Following the end of their romantic relationship, Eaddy and Stallings decided to hire Douglas Scott

Leggat ("Leggat") as an advisor to Local Social. (Compl. ¶ 19; Answer & Countercls. 3, ¶ 19.)

19. On September 8, 2015, Eaddy and Stallings entered into an arbitration agreement. (Compl. ¶ 20; Answer & Countercls. 3, ¶ 20.)

20. On September 9, 2015, Leggat conducted an arbitration hearing between Eaddy and Stallings. (Compl. ¶ 21; Answer & Countercls. 3, ¶ 21.) As a result of the arbitration conducted pursuant to the arbitration agreement, Eaddy, Stallings, and Local Social executed the Shareholders' Agreement and the Exit Agreement. (Compl. ¶ 21; Answer & Countercls. 3, ¶ 21.)

**1. The Shareholders' Agreement.**

21. The Shareholders' Agreement, dated September 9, 2015, contains an arbitration provision, a Delaware choice of law clause, and a mandatory forum selection clause providing that any action relating to the Shareholders' Agreement shall be instituted in Wake County, North Carolina. (Compl. Ex. D, ¶¶ 23, 35.)

**2. The Exit Agreement.**

22. The Exit Agreement, dated September 9, 2015, contains a North Carolina choice of law clause and a mandatory forum selection clause providing that any action relating to the Exit Agreement shall be instituted in Wake County, North Carolina. (Compl. Ex. C, ¶ 34.) The Exit Agreement does not contain an arbitration provision. (Compl. Ex. C.)

### 3. The Bylaws.

23. In conjunction with the Exit Agreement, on September 9, 2015, Local Social adopted the Bylaws. (Compl. ¶ 26, Ex. E; Answer & Countercls. 3, ¶ 26.) The Bylaws contain an arbitration provision. (Compl. Ex. E, at 11–12.) In accordance with the Bylaws, on September 9, 2015, Eaddy and Stallings selected Leggat as a director of Local Social. (Compl. ¶ 28; Answer & Countercls. 4, ¶ 28.)

### F. Claims for Relief

24. Plaintiffs assert the following claims against Stallings: (1) breach of fiduciary duty and constructive fraud ("First Claim"); (2) conversion and misappropriation ("Second Claim"); (3) breach of the Exit Agreement ("Third Claim"); (4) breach of the Shareholders' Agreement ("Fourth Claim"); (5) constructive trust ("Fifth Claim"); (6) accounting ("Sixth Claim"); (7) computer trespass ("Seventh Claim"); (8) unfair and deceptive trade practices ("UDTP") ("Eighth Claim"); (9) punitive damages ("Ninth Claim"); (10) enforcement of the Promissory Note ("Tenth Claim"); and (11) judicial enforcement of a security interest ("Eleventh Claim"). (Compl. 12–21.)

25. Stallings asserts the following counterclaims against Plaintiffs: (1) breach of the Exit Agreement ("First Counterclaim"); (2) breach of the Shareholders' Agreement ("Second Counterclaim"); (3) breach of the Bylaws ("Third Counterclaim"); (4) violation of the North Carolina Wage and Hour Act ("Fourth Counterclaim"); and (5) conversion ("Fifth Counterclaim"). (Answer & Countercls. 16–19.)

## IV. CONCLUSIONS OF LAW

### A. Applicable Law

26. Defendant moves to compel arbitration of all claims and counterclaims in this action pursuant to N.C. Gen. Stat. § 1-569.7. (Mot. Stay Proceedings & Compel Arbitration, ECF No. 10.) Defendant contends that arbitration is mandated by the Bylaws or, alternatively, the Bylaws, the Shareholders' Agreement, and the Stock Purchase Agreement. (Def.'s Br. Supp. Mot. Stay Proceedings & Compel Arbitration 8–13, ECF No. 12.1.) In considering a motion to compel arbitration, a court must first determine whether the FAA or state law applies to the alleged agreements to arbitrate. *Epic Games, Inc. v. Murphy-Johnson*, 785 S.E.2d 137, 142 (N.C. Ct. App. 2016).

27. The FAA applies to a contract that evidences a transaction involving commerce. 9 U.S.C. § 2; *Szymczyk v. Signs Now Corp.*, 168 N.C. App. 182, 185, 606 S.E.2d 728, 731–32 (2005). The Supreme Court of the United States has determined that "the word 'involving' is broad and is indeed the functional equivalent of 'affecting[,]'" and its use evidences Congress's intent to exercise the full scope of Congress's commerce clause power. *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 273–74 (1995); *see Gaylor, Inc. v. Vizor, LLC*, 2015 NCBC LEXIS 102, at *10 (N.C. Super. Ct. Oct. 30, 2015). The parties contend, and the Court agrees, that the FAA applies to all of the alleged arbitration agreements at issue. (Pls.' Joint Br. Resp. Court's Briefing Order 6, ECF No. 32 ["Pls.' Suppl. Br."]; Def.'s Br. Resp. Court's Briefing Order 2, ECF No. 33 ["Def.'s Suppl. Br."].) The agreements at issue concern

the ownership and management of a corporation doing business in multiple states. (Aff. Stallings ¶ 4.) Thus, the agreements involve interstate commerce and are governed by the FAA. *See Metropolitan Entm't Co. v. Koplik*, 20 F. Supp. 2d 354, 362−63 (D. Conn. 1998) ("Because the Shareholders' Agreement at issue in this case concerns the management and operation of Metropolitan in numerous states, . . . we hold that it involves interstate commerce and is subject to the FAA." (citation omitted)).

28.     When the FAA applies to an agreement, however, "state law generally governs issues concerning the formation, revocability, and enforcement of arbitration agreements." *Park v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 159 N.C. App. 120, 122, 582 S.E.2d 375, 378 (2003). As a result, the Court must determine which state's law applies to the arbitration agreements at issue.

29.     The parties contend, and the Court agrees, that Delaware law applies to the Stock Purchase Agreement and the Shareholders' Agreement. *See Cable Tel Servs., Inc. v. Overland Contracting, Inc.*, 154 N.C. App. 639, 643, 574 S.E.2d 31, 34 (2002) ("[T]he parties' choice of law is generally binding on the interpreting court as long as they had a reasonable basis for their choice and the law of the chosen State does not violate a fundamental policy of the state of otherwise applicable law." (quotation marks omitted)).

30.     With respect to the Bylaws, Plaintiffs argue that Delaware law applies because, according to Plaintiffs, the Bylaws contain a Delaware choice of law clause. (Pls.' Suppl. Br. 13.) Conversely, Defendant argues that the Bylaws do not contain a

choice of law clause and, under the *lex loci* doctrine, North Carolina law applies to the Bylaws because the Bylaws were entered into in North Carolina. (Def.'s Suppl. Br. 5–6.)

31. Contrary to Plaintiffs' contention, the Bylaws do not contain a Delaware choice of law clause. The Bylaws state that "the provisions of the Delaware Uniform Arbitration Act shall apply in any such arbitration proceedings." (Compl. Ex. E, at 12.) The Bylaws do not provide that the laws of Delaware, or any other state, govern the interpretation or enforcement of the Bylaws. *See Cable Tel Servs., Inc.*, 154 N.C. App. at 641, 574 S.E.2d at 33 ("[A] 'choice of law' clause may provide that the substantive laws of a particular state govern the construction and validity of the contract."). Accordingly, the Court must apply traditional conflict of laws principles to determine which state's substantive laws apply.

32. Here, there are competing conflict of laws doctrines. Under the *lex loci* doctrine, "the interpretation of a contract is governed by the law of the place where the contract was made." *Id.* at 642, 574 S.E.2d at 33. Pursuant to the internal affairs doctrine, however, "only one State should have the authority to regulate a corporation's internal affairs—matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders— because otherwise a corporation could be faced with conflicting demands." *Bluebird Corp. v. Aubin*, 188 N.C. App. 671, 680, 657 S.E.2d 55, 63 (2008) (quoting *Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982)).

33.     This Court was presented with similar facts in *Mancinelli v. Momentum Research, Inc.*, 2012 NCBC LEXIS 30 (N.C. Super. Ct. May 17, 2012).  In that case, a shareholder-plaintiff asserted a claim against the corporation for breach of the shareholder agreement.  2012 NCBC LEXIS 30, at *1.  Plaintiff argued that, under the *lex loci* doctrine, North Carolina law applied to the shareholder agreement because the agreement was entered into in North Carolina.  *Id.* at *7.  Defendant argued that because it was a Delaware corporation, Delaware law applied to the agreement pursuant to the internal affairs doctrine.  *Id.*  Recognizing that the issuance of shares is a matter peculiar to a corporation's internal affairs, Judge Jolly concluded:

> [I]n light of the policy rationale behind the "internal affairs doctrine," the court concludes the "internal affairs doctrine" should apply to the present case.  Applying the *lex loci* doctrine under the facts alleged in this action would erode the "internal affairs doctrine."  Such application effectively would render the doctrine meaningless in almost all cases where a corporate internal issue arises from a breach of contract dispute between a shareholder and the corporation.

*Id.* at *12.

34.     Similar to an agreement among a corporation and its shareholders, "the bylaws of a Delaware corporation constitute part of a binding broader contract among the directors, officers, and stockholders formed within the statutory framework of the [Delaware General Corporation Law]." *Boilermakers Local 154 Ret. Fund v. Chevron Corp.*, 73 A.3d 934, 939 (Del. Ch. 2013).  "By its plain terms, [Del. Code Ann. tit. 8,] § 109 provides stockholders with a broad right to adopt bylaws relating to the business of the corporation, the conduct of its affairs, and its rights or powers or the

rights or powers of its stockholders, directors, officers or employees." *Hollinger Int'l, Inc. v. Black*, 844 A.2d 1022, 1078 (Del. Ch. 2004) (quotation marks omitted). Therefore, as the Bylaws concern the internal affairs of Local Social, a Delaware corporation, the Court concludes that Delaware law applies to the Bylaws.

## B. Arbitrability

35. Arbitrability is an issue that is subject to state law governing the formation of contracts, and courts are to apply state-law principles giving due regard to the federal policy favoring arbitration. *Forshaw Indus. Inc. v. Insurco, Ltd.*, 2 F. Supp. 3d 772, 786−87 (W.D.N.C. 2014); *Millar v. Reliastar Life Ins. Co.*, 157 F. Supp. 2d 645, 647 (W.D.N.C. 2000). "In considering a motion to compel arbitration, a court must consider: (1) whether the issue of arbitrability should be decided by the court or the arbitrator; and if by the court, (2) whether the claims should be resolved in arbitration (the issue of arbitrability)." *Legend Natural Gas II Holdings, LP v. Hargis*, C.A. No. 7213-VCP, 2012 Del. Ch. LEXIS 225, at *11 (Del. Ch. Sept. 28, 2012). Courts distinguish between issues of procedural arbitrability, on the one hand, and issues of substantive arbitrability, on the other hand. *Id.* Procedural arbitrability refers to disputes about particular procedural preconditions to arbitration, waiver, and other similar defenses to arbitrability. *James & Jackson, LLC v. Willie Gary, LLC*, 906 A.2d 76, 79 (Del. 2006). Courts presume that the parties intended arbitrators to decide issues of procedural arbitrability. *Id.*

36. "Substantive arbitrability issues are gateway questions about the scope of an arbitration provision and its applicability to a given dispute." *Id.* "Substantive

arbitrability involves, among other things, the applicability of an arbitration clause, the scope of an arbitration provision, and whether an arbitration clause is valid and enforceable. When examining substantive arbitrability, the underlying question is whether the parties decided in the contract to submit a particular dispute to arbitration." *Hargis*, 2012 Del. Ch. LEXIS 225, at *11−12 (footnote and quotation marks omitted). Courts presume that the parties intended courts to decide issues of substantive arbitrability. *Id.* at *12. "There is an exception, however, when there is 'clear and unmistakable evidence' that the parties intended otherwise." *Willie Gary*, 906 A.2d at 78. In *Willie Gary*, the Supreme Court of Delaware articulated a two-prong test for what constitutes clear and unmistakable evidence that the parties intended for an arbitrator to decide issues of substantive arbitrability. *Id.* at 80. This test requires "(1) an arbitration clause that generally provides for arbitration of all disputes; and (2) a reference to a set of arbitration rules that empower arbitrators to decide arbitrability, such as the American Arbitration Association ('AAA') Rules." *Hargis*, 2012 Del. Ch. LEXIS 225, at *13−14. Two years later, in *McLaughlin v. McCann*, then Vice Chancellor Strine elaborated on the first prong of the *Willie Gary* test as follows:

> What I take away from the "generally provides for arbitration of all disputes" requirement is that the carveouts and exceptions to committing disputes to arbitration should not be so obviously broad and substantial as to overcome a heavy presumption that the parties agreed by referencing the AAA Rules and deciding to use AAA arbitration to resolve a wide range of disputes that the arbitrator, and not a court, would resolve disputes about substantive arbitrability.

942 A.2d 616, 625 (2008).

### 1. The Bylaws.

37. Defendant first argues that all claims and counterclaims are subject to arbitration under the Bylaws. (Def.'s Br. Supp. 8.) The Court must first determine whether the Court or the arbitrator is to decide issues of substantive arbitrability.

### a. The Court decides issues of substantive arbitrability under the Bylaws.

38. Defendant argues that, under the Bylaws, the arbitrator is to determine issues of substantive arbitrability. (Def.'s Br. Supp. 9, 11; Def.'s Suppl. Br. 6–8.) Conversely, Plaintiffs contend that the Court is to determine issues of substantive arbitrability. (Pls.' Joint Resp. Opp'n Stallings's Mot. Stay & Compel Arbitration 9–10, ECF No. 17; Pls.' Suppl. Br. 13–14.)

39. The arbitration provision in the Bylaws provides, in relevant part:

> *Any dispute arising under these Bylaws* which cannot be settled amicably by the officers, directors, or shareholders, as the case may be, *and which results in a deadlock*, shall be determined by a single arbitrator appointed by the American Arbitration Association ("AAA") pursuant to the Commercial Arbitration Rules of the AAA. The arbitration shall in all respects be governed and conducted by applicable AAA rules . . . . In the event that preliminary or permanent injunctive relief is necessary or desirable prior to the decision or award of the arbitrator in order to prevent a party from acting contrary to the provisions of these Bylaws, and to prevent irreparable harm prior to a confirmation of an arbitration decision or award, then either party is authorized and entitled to commence a lawsuit solely to obtain equitable relief against the other in a court having jurisdiction over the parties pending the completion of the arbitration. . . . *Notwithstanding the foregoing, nothing contained herein shall prevent any party (i) from applying to any state or federal court of competent jurisdiction for the remedies of specific performance, injunctive relief, or other non-monetary equitable remedies . . . .*

(Compl. Ex. E, at 11–12 (emphasis added).)

40. The second prong of the *Willie Gary* test is not at issue as the Bylaws expressly incorporate the Commercial Arbitration Rules of the American Arbitration Association ("AAA"), which empower the arbitrator to decide issues of arbitrability. (Def.'s Br. Supp. Ex. B, at 13, ECF No. 12.2.) The first prong of the *Willie Gary* test— whether the arbitration clause "generally provides for arbitration of all disputes"—is at issue.

41. In *Willie Gary*, the disputed contract contained an arbitration clause that stated

> [a]ny controversy or claim arising out of or relating to this [a]greement or the breach of this [a]greement shall be settled by arbitration . . . in accordance with the then-existing rules of the [AAA]. . . . [I]n addition to any other remedy to which the nonbreaching [m]embers may be entitled, at law or in equity, the nonbreaching [m]embers shall be entitled to injunctive relief to prevent breaches of the provisions of this [a]greement and specifically to enforce the terms and provisions hereof in any action instituted in any court of the United States or any state thereof having subject matter jurisdiction thereof.

*Willie Gary*, 906 A.2d at 79–80 (omissions in original). In analyzing this language, the court concluded that the arbitration clause did not generally provide for arbitration of all disputes, reasoning as follows:

> In this case, the arbitration clause begins by requiring arbitration of any controversy arising out of or relating to the LLC [a]greement in accordance with the AAA rules. But it continues by expressly authorizing the nonbreaching [m]embers to obtain injunctive relief and specific performance in the courts. Thus, despite the broad language at the outset, not all disputes must be referred to arbitration.

*Id.* at 81.

42. Based on *Willie Gary* and its progeny, the Court concludes that the Bylaws do not generally provide for arbitration of all disputes. The arbitration provision

begins by requiring arbitration of "[a]ny dispute arising under" the Bylaws that "results in a deadlock." (Compl. Ex. E, at 11.) This language is narrower than the broad, unqualified language in the arbitration clauses at issue in *Willie Gary* and other cases that required arbitration of any or all disputes arising under or relating to an agreement. *See Li v. Standard Fiber, LLC*, C.A. No. 8191-VCN, 2013 Del. Ch. LEXIS 83, at *4, *20 (Del. Ch. Mar. 28, 2013) (concluding that the first prong was satisfied where the arbitration provision required arbitration of "[a]ny controversy or claim arising out of or relating to this [a]greement, or the breach thereof" and did not contain any carve-outs); *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 655 (Del. Ch. 2012) (concluding that the first prong was satisfied where the arbitration provision required arbitration of "[a]ny controversy, dispute or claim arising out of or relating to this [a]greement or the breach thereof" and did not contain any carve-outs); *ORIX LF, LP v. InsCap Asset Mgmt., LLC*, C.A. No. 5063-VCS, 2010 Del. Ch. LEXIS 70, at *9−10, *23 (Del. Ch. Apr. 13, 2010) (concluding that the first prong was satisfied where the arbitration provision required arbitration of "any dispute, controversy or claim arising out of or relating to this [a]greement, or the breach, termination or validity thereof" and only contained an exception for matters subject to a different section of the agreement that provided for a special arbitration proceeding); *Julian v. Julian*, Civil Action No. 4137-VCP, 2009 Del. Ch. LEXIS 164, at *18−19 (Del. Ch. Sept. 9, 2009) (concluding that the first prong was satisfied where the arbitration provision required arbitration of "[a]ny controversy or claim arising out of or relating to the [a]greement" and did not contain any carve-outs); *Carder v. Carl M. Freeman Cmtys.,*

*LLC*, Civil Action No. 3319-VCP, 2009 Del. Ch. LEXIS 2, at *12, *16 (Del. Ch. Jan. 5, 2009) (concluding that the first prong was satisfied where the arbitration provision required arbitration of "all disputes arising in any way under the [a]greement" and did not contain any carve-outs).

43. The arbitration provision in the Bylaws is further distinguishable from those arbitration provisions that require arbitration of all disputes arising under an agreement but contain limited carve-outs for disputes relating to specific provisions. *Compare Redeemer Comm. of the Highland Crusader Fund v. Highland Capital Mgmt., L.P.*, Civil Action No. 12533-VCG, 2017 Del. Ch. LEXIS 30, at *14−18 (Del. Ch. Feb. 23, 2017) (concluding that the first prong was satisfied where an otherwise broad arbitration clause required arbitration of all disputes but carved out disputes regarding the existence of "cause" or the repayment or payment in respect of "indemnification obligations"), *and Hargis*, 2012 Del. Ch. LEXIS 225, at *15 & n.43 (noting the existence of "a limited carve-out . . . for the purpose of temporarily, preliminarily, or permanently, [sic] enforcing the provisions of [s]ection 9 ([c]onfidentiality) and [s]ection 10 ([a]greement [n]ot to [c]ompete) in any state or federal court of competent jurisdiction" but concluding that "the carve-out is limited to the enforcement of two specific provisions, neither of which is relevant to this dispute, and, thus, does not overcome the presumption created by a reference to the AAA [r]ules in favor of having an arbitrator resolve disputes about substantive arbitrability"), *with Isr. Disc. Bank of N.Y. v. First State Depository Co., LLC*, C.A. No. 7237-VCP, 2012 Del. Ch. LEXIS 226, at *17−19 (Del. Ch. Sept. 27, 2012)

(concluding that the first prong was not satisfied where the arbitration provision provided that "[e]xcept for interpleader suits, the [p]arties agree that any controversy or claim arising out of or in connection with this [a]greement, or the breach thereof, shall be settled by arbitration"), *and Brown v. T-Ink, LLC*, Civil Action No. 3190-VCP, 2007 Del. Ch. LEXIS 174, at *3, *33 (Del. Ch. Dec. 4, 2007) (concluding that the first prong was not satisfied where the arbitration provision required arbitration of any dispute "concerning the interpretation or performance of this [a]greement").

44. Further, like the arbitration provision in *Willie Gary*, the arbitration provision in the Bylaws expressly states that it does not prevent the parties from obtaining injunctive relief and specific performance in the courts. *Willie Gary*, 906 A.2d at 81 ("But [the arbitration provision] continues by expressly authorizing the nonbreaching [m]embers to obtain injunctive relief and specific performance in the courts."); *BAYPO Ltd. P'ship v. Tech. JV, LP*, 940 A.2d 20, 23, 25 (Del. Ch. 2007) ("[T]he Delaware Supreme Court in *Willie Gary* refused to apply the majority exception because the arbitration provision expressly authorized broad judicial recourse for injunctive relief and specific performance."). *But see Greenstar IH Rep, LLC v. Tutor Perini Corp.*, C.A. No. 12885-VCS, 2017 Del. Ch. LEXIS 29, at *14−15 (Del. Ch. Feb. 23, 2017) (concluding that an arbitration provision that permitted the parties to seek injunctive relief in the courts, but otherwise required arbitration of all disputes, satisfied the first prong of *Willie Gary*).

45. Therefore, because the arbitration provision applies only to disputes arising under the Bylaws that result in a deadlock, and because the arbitration provision

authorizes the parties to obtain injunctive relief and specific performance in the courts, the Court concludes that the arbitration provision does not generally provide for arbitration of all disputes. Accordingly, as in *Willie Gary*, something other than incorporation of the AAA rules is necessary to show that the parties intended to submit the issue of substantive arbitrability to the arbitrator. *See GTSI Corp. v. Eyak Tech., LLC*, 10 A.3d 1116, 1118, 1120 (Del. Ch. 2010) (concluding that the court need not determine whether the arbitration provision generally provided for arbitration of all disputes where the provision expressly required arbitration of "any dispute . . . arising out of, or in connection with, the execution, interpretation, performance or non-performance of this [a]greement (*including the validity, scope and enforceability of these arbitration provisions*)" (emphasis added)); *BAYPO*, 940 A.2d at 23, 25 (concluding that although the arbitration provision permitted the parties to seek injunctive relief in the courts to preserve the status quo pending arbitration, the first prong was satisfied because the arbitration provision expressly provided that the arbitrator "shall decide all [d]isputes and all *substantive and procedural issues related thereto*" (alteration in original)); *Nutzz.com, LLC v. Vertrue, Inc.*, Civil Action Nos. 1231-N, 1719-N, 2006 Del. Ch. LEXIS 137, at *4, *20−21 (Del. Ch. July 25, 2006) (concluding that although the arbitration provision contained two carve-outs, the first prong was satisfied because the arbitration provision expressly required arbitration of "issues relating to arbitrability or the scope of this arbitration clause"). Absent any such evidence, the Court concludes that it must decide issues of substantive arbitrability.

### b. Arbitrability of Plaintiffs' claims under the Bylaws.

46. Stallings argues that all of Plaintiffs' claims "can generally be categorized as disputes arising under the Bylaws which the parties have been unable to settle amicably and which have resulted in a deadlock." (Def.'s Br. Supp. 8.) Stallings contends that Eaddy and Local Social have refused to conduct an annual shareholders' meeting, as required by the Bylaws, and as a result, Leggat's successor on the board of directors cannot be elected. (Def.'s Br. Supp. 8.) According to Stallings, "[a]ll of the remaining disputes are the result of the deadlocked dispute between Eaddy and Stallings as equal shareholders and directors of [Local Social]." (Def.'s Br. Supp. 9.)

47. As an initial matter, the Court addresses Plaintiffs' argument that there is no valid agreement to arbitrate. In order for claims to be subject to arbitration, there must be a valid agreement to arbitrate. *RBC Capital Mkts. Corp. v. Thomas Weisel Partners LLC*, C.A. Nos. 4709-VCN, 4760-VCN, 2010 Del. Ch. LEXIS 36, at *28 (Del. Ch. Feb. 25, 2010). Plaintiffs contend that there is no valid agreement to arbitrate under the Bylaws because Plaintiffs' contractual claims are for breach of the Exit Agreement, Promissory Note, and Security Agreement, which do not contain arbitration provisions. (Pls.' Resp. Opp'n 12–14.) Although this argument purports to dispute the existence of a valid arbitration agreement, it instead disputes whether Plaintiffs' claims fall within the scope of an agreement to arbitrate. Indeed, Plaintiffs argue that the Exit Agreement, Promissory Note, and Security Agreement "are enforceable contracts that the parties entered into and never agreed to arbitrate.

Stallings' attempt to shoehorn Plaintiff's [sic] claims arising under these [a]greements into the *scope of the arbitration provision in the Bylaws* fails[.]" (Pls.' Resp. Opp'n 13–14 (emphasis added).) Further, the adoption of the Bylaws by the parties—including Plaintiffs—is undisputed. (Compl. ¶ 26; Answer & Countercls. 3, ¶ 26.) Thus, the Court concludes that a valid agreement to arbitrate exists. The Court now turns to whether Plaintiffs' claims fall within the scope of that agreement.

48.      As stated by the Supreme Court of Delaware:

> When the arbitrability of a claim is disputed, the court is faced with two issues. First, the court must determine whether the arbitration clause is broad or narrow in scope. Second, the court must apply the relevant scope of the provision to the asserted legal claim to determine whether the claim falls within the scope of the contractual provisions that require arbitration. If the court is evaluating a narrow arbitration clause, it will ask if the cause of action pursued in court directly relates to a right in the contract. If the arbitration clause is broad in scope, the court will defer to arbitration on any issues that touch on contract rights or contract performance.

*Parfi Holding AB v. Mirror Image Internet, Inc.*, 817 A.2d 149, 155 (Del. 2002). The presumption in favor of arbitration, however, "will not trump basic principles of contract interpretation, for a litigant cannot be required to submit to arbitration any dispute which [it] has not agreed to so submit." *NAMA Holdings, LLC v. Related World Mkt. Ctr., LLC*, 922 A.2d 417, 430 (Del. Ch. 2007) (alteration in original) (footnote and quotation marks omitted). "[C]ontracting parties who provide for the arbitration of disputes in their agreements need submit to arbitration only those claims that touch on the legal rights created by their contract." *Parfi Holding*, 817 A.2d at 151.

49.    Here, because the arbitration provision only provides for arbitration of disputes arising under the Bylaws that result in a deadlock, and because it permits the parties to seek injunctive relief and specific performance in the courts, the arbitration provision is arguably narrow in scope. Nevertheless, even assuming arguendo that the arbitration provision is broad in scope, the Court concludes that Plaintiffs' claims do not fall within the scope of the arbitration provision in the Bylaws.

### (1)    First, Second, Third, and Eighth Claims.

50.    Plaintiffs' First Claim for breach of fiduciary duty and constructive fraud is based on allegations that Stallings, as an officer before his termination and as a director both before and after his termination, breached his fiduciary duties to Local Social by misappropriating and diverting Local Social's funds and assets for Stallings's personal expenses; improperly accessing Local Social's computer systems, deleting company records, and preventing Local Social from accessing company information; and making disparaging comments about Eaddy and Leggat to Local Social's employees and customers. (Compl. ¶¶ 76–87.) Stallings contends that Plaintiffs' First Claim arises under the Bylaws because it is based on Stallings's alleged conduct as an officer and director, and the election, duties, and authorities of officers and directors are dictated by the Bylaws. (Def.'s Br. Supp. 10.)

51.    Generally speaking, the Bylaws concern shareholder meetings; the election and power of directors; director meetings; the election and power of officers; contracts, loans, checks, and deposits; and share certificates. (Compl. Ex. E.) "The directors of

Delaware corporations stand in a fiduciary relationship not only to the stockholders but also to the corporations upon whose boards they serve." *Malone v. Brincat*, 722 A.2d 5, 10 (Del. 1998). The Bylaws do not create or implicate Stallings's fiduciary duties or Plaintiffs' claim for breach thereof. "[P]urportedly independent actions do not touch matters implicated in a contract if the independent cause of action could be brought had the parties not signed a contract." *Feeley*, 62 A.3d at 656 (alteration in original); *see also Parfi Holding*, 817 A.2d at 155 ("The issue is whether the fiduciary duty claims implicate any of the rights and obligations provided for in the Underwriting Agreement. Stated differently, do the fiduciary duty claims depend on the existence of the Underwriting Agreement?"). Plaintiffs' First Claim for breach of fiduciary duty does not depend on the existence of the Bylaws. Like the defendant in *Parfi Holding*, Stallings "cannot point to any contract term [in the Bylaws] that creates a species of obligation upon which [Plaintiffs] can base a breach of fiduciary duty claim." *Parfi Holding*, 817 A.2d at 158. As such, "[t]he fiduciary duties [Stallings] owes [Plaintiffs] are beyond the [Bylaws] and rest on an independent set of rights provided for in the Delaware corporation law." *Id.*

52.     Plaintiffs' Second Claim for conversion and misappropriation is based on allegations that Stallings improperly used Local Social's funds and assets for his personal use, thereby converting Local Social's funds and assets. (Compl. ¶¶ 88−94.) Plaintiffs' Third Claim, for breach of the Exit Agreement, alleges that Stallings's conduct constituted a breach of the provision of the Exit Agreement providing that "[a]fter October 31, 2015, neither [Eaddy] nor [Stallings] shall charge any personal

expenses to [Local Social]'s credit card or otherwise to [Local Social.]" (Compl. Ex. C, ¶ 10.) Plaintiffs further contend that Stallings's conduct constituted a breach of the Exit Agreement provision that "[a]ll members of the board of directors have a fiduciary duty to [Local Social] regardless of employment status." (Compl. Ex. C, ¶ 5.) Plaintiffs' Eighth Claim, for UDTP pursuant to N.C. Gen. Stat. § 75-1.1, is based on Stallings's alleged conversion, improper access of Local Social's computer systems and information, and disparaging remarks about Plaintiffs. (Compl. ¶¶ 132–37.)

53. As with Plaintiffs' First Claim, Stallings contends that Plaintiffs' Second, Third, and Eighth Claims arise under the Bylaws because they are based on Stallings's alleged conduct as an officer and director, and the election, duties, and authorities of officers and directors are dictated by the Bylaws. (Def.'s Br. Supp. 10.)

54. Just as Plaintiffs' breach of fiduciary duty claim does not depend on the existence of the Bylaws, Plaintiffs' claims for conversion and misappropriation, breach of the Exit Agreement, and UDTP neither depend on the existence of the Bylaws nor touch on matters that concern the rights or obligations thereunder. In fact, these claims are entirely unrelated to the Bylaws.

55. Therefore, the Court concludes that Plaintiffs' First, Second, Third, and Eighth Claims do not fall within the scope of the arbitration provision in the Bylaws.

### (2) Fourth and Seventh Claims.

56. Plaintiffs' Fourth Claim, for breach of the Shareholders' Agreement, alleges that Stallings made critical and damaging remarks about Eaddy and Leggat to Local Social's customers, employees, and other parties related to Local Social in violation

of the non-disparagement provision.  (Compl. ¶¶ 105–07.)  The non-disparagement

provision states that

> [Eaddy and Stallings] promise and agree that they shall not make
> negative, critical, defamatory, slanderous, libelous, damaging, or
> disparaging remarks to third-parties about each other or [Local Social],
> whether oral or written, or about any of the Shareholders' or [Local
> Social]'s officers, directors, agents, shareholders, owners, principals,
> affiliates, subsidiaries, successors, or predecessors; or about any of their
> or [Local Social]'s business practices or relationships.

(Compl. Ex. D, ¶ 15.)

57.    Plaintiffs' Seventh Claim, for computer trespass, is brought pursuant to

N.C. Gen. Stat. § 14-458 and is based on allegations that Stallings improperly

accessed Local Social's computer systems and data after Local Social removed

Stallings as president and terminated Stallings's employment in November 2016.

(Compl. ¶¶ 122–31.)

58.    Stallings makes no argument as to how Plaintiffs' Fourth or Seventh

Claims are disputes arising under the Bylaws.  "An arbitration clause, no matter how

broadly construed, can extend only so far as the series of obligations set forward in

the underlying agreement."  *Parfi Holding*, 817 A.2d at 156.  Plaintiffs' Fourth and

Seventh Claims neither depend on the existence of the Bylaws nor touch on matters

that concern the rights or obligations thereunder.  Therefore, the Court concludes

that Plaintiffs' Fourth and Seventh Claims do not fall within the scope of the

arbitration provision in the Bylaws.

**(3)     Fifth, Sixth, and Ninth Claims.**

59.     Plaintiffs' Fifth Claim seeks the imposition of a constructive trust, contending that Stallings, by breaching his fiduciary duties, improperly gained possession or control of Local Social's property, assets, and funds.   (Compl. ¶¶ 111–17.)   Plaintiffs' Sixth Claim seeks an accounting based on Stallings's misappropriation of Local Social's assets and property.   (Compl. ¶¶ 118–21.) Plaintiffs' Ninth Claim seeks punitive damages based on Stallings's breach of his duties to Local Social.  (Compl. ¶¶ 138–40.)

60.     Stallings contends that Plaintiffs' Fifth, Sixth, and Ninth Claims are not causes of action, but rather simply seek a remedy for Stallings's conduct underlying Plaintiffs' First, Second, Third, and Eighth Claims, which Stallings argues are arbitrable under the Bylaws.  (Def.'s Br. Supp. 10–11.)   The Court agrees with Stallings's argument as it relates to remedies not being causes of action.  As discussed above, however, the underlying claims upon which the claimed remedies rest do not fall within the scope of the arbitration provision in the Bylaws.  Therefore, the Court concludes that Plaintiffs' Fifth, Sixth, and Ninth Claims do not fall within the scope of the arbitration provision in the Bylaws.

**(4)     Tenth and Eleventh Claims.**

61.     In her Tenth and Eleventh Claims, Eaddy contends that Stallings is in default under the Promissory Note and Security Agreement based on Stallings's breach of the Exit Agreement and, as a result, Eaddy seeks enforcement of these two

agreements including enforcement of her security interest in Stallings's fifty shares of Local Social Stock. (Compl. ¶¶ 143, 145–49.)

62. The Security Agreement provides, in relevant part, that

> [Stallings] shall be in default under this Agreement upon the happening of any of the following events or conditions:
>
> (a) The occurrence of a default under or with respect to any of the Obligations or under any Note or other instrument evidencing the same, or the breach by [Stallings] of any covenant or condition contained in this Agreement;
>
> . . . .
>
> (e) The occurrence of anything which [Eaddy] in good faith believes endangers the [fifty shares of Local Social stock] or [Stallings]'s ability to perform his obligations hereunder.

(Compl. Ex. B, at 3–4.) Eaddy contends that Stallings is in default under subsections (a) and (e) because Stallings improperly used Local Social's credit cards and funds in breach of the Exit Agreement, Stallings made disparaging and critical remarks about Eaddy and Leggat in breach of the Shareholders' Agreement, and Stallings improperly accessed Local Social's systems and thereby caused Local Social significant financial damage. (Compl. ¶ 148.)

63. Stallings makes no argument in his briefs as to how Eaddy's Tenth or Eleventh Claims are disputes arising under the Bylaws. "[T]he existence of a 'broad' contractual arbitration provision does not require the parties to arbitrate all disputes that might arise between them." *Majkowski v. Am. Imaging Mgmt. Servs., LLC*, 913 A.2d 572, 583 (Del. Ch. 2006). Eaddy's Tenth Claim for enforcement of the Promissory Note and Eleventh Claim for judicial enforcement of her security interest

are wholly independent of the Bylaws and do not touch on matters that concern the rights or obligations thereunder. Therefore, the Court concludes that Plaintiffs' Tenth and Eleventh Claims do not fall within the scope of the arbitration provision in the Bylaws.

### c. Arbitrability of Defendant's counterclaims.

### (1) First and Second Counterclaims.

64. Stallings's First Counterclaim for breach of the Exit Agreement is based on allegations that Plaintiffs have (1) failed to provide Stallings with monthly financial reports as required by paragraph 15 of the Exit Agreement, (2) failed to conduct board of directors' meetings as required by paragraph 15 of the Exit Agreement, (3) failed to provide Stallings with access to Local Social's documents as required by paragraph 17 of the Exit Agreement, (4) refused to allow Stallings to inspect Local Social's books and records as required by paragraph 17 of the Exit Agreement, (5) failed to pay Stallings in accordance with paragraph 21 of the Exit Agreement, (6) failed to give Stallings the maximum gift exclusion allowance in violation of paragraph 26 of the Exit Agreement, and (7) disclosed the existence and terms of the Exit Agreement in violation of paragraph 31 thereof. (Answer & Countercls. 16, ¶ 7.)

65. Stallings's Second Counterclaim for breach of the Shareholders' Agreement is based on allegations that Plaintiffs (1) failed to provide Stallings with his tax distribution as required by paragraph 13 of the Shareholders' Agreement, (2) failed to make required tax distributions and issued schedule K-1s in violation of paragraph 13 of the Shareholders' Agreement, and (3) made disparaging remarks about

Stallings in violation of paragraph 15 of the Shareholders' Agreement. (Answer & Countercls. 17, ¶ 14.)

66. Stallings makes no argument as to how his First or Second Counterclaim are disputes arising under the Bylaws. These claims do not depend on the existence of the Bylaws or concern matters that touch on the rights or obligations thereunder. Therefore, the Court concludes that Stallings's First and Second Counterclaims do not fall within the scope of the arbitration provision in the Bylaws.

### (2) Third Counterclaim.

67. Stallings's Third Counterclaim for breach of the Bylaws is based on allegations that Plaintiffs have failed to hold both an annual shareholders' meeting and a regular meeting of the board of directors as required by the Bylaws. (Answer & Countercls. 18, ¶ 20.) Even considering the arbitration provision as narrow in scope, this claim unquestionably involves a dispute that arises under the Bylaws as it directly relates to an obligation expressly created by the Bylaws—the obligation to have annual shareholders' meetings and regular meetings of the board of directors. *See Parfi Holding*, 817 A.2d at 155 ("If the court is evaluating a narrow arbitration clause, it will ask if the cause of action pursued in court directly relates to a right in the contract.").

68. Whether the underlying dispute results in a deadlock is not as clear. Stallings argues that a deadlock exists between Eaddy and Stallings as the sole and equal shareholders of Local Social. (Def.'s Br. Supp. 8–9.) Plaintiffs argue that a shareholder deadlock between Eaddy and Stallings is not possible due to a provision

in the Shareholders' Agreement, which provides that the chairman of the board of directors shall have a tie-breaking vote with respect to any shareholder-deadlocked matter. (Pls.' Resp. Opp'n 15–17.) Unlike the Shareholders' Agreement, however, the Bylaws do not address the meaning of "deadlock." Further, the Bylaws do not provide a mechanism by which any such deadlock may be broken. The current edition of *Black's Law Dictionary* defines "deadlock" as "[a] state of inaction resulting from opposition, a lack of compromise or resolution, or a failure of election[,]" and "[t]he blocking of corporate action by one or more factions of shareholders or directors who disagree about a significant aspect of corporate policy." *Black's Law Dictionary* (10th ed. 2014). Arguably, the failure to hold meetings is a "state of inaction" resulting from Eaddy and Stallings's failure to compromise, thereby constituting a "deadlock."

69. Although whether the dispute has resulted in a "deadlock" as that term is used in the Bylaws is not clear, the dispute underlying Stallings's Third Counterclaim for breach of the Bylaws clearly arises under the Bylaws, and "[a]ny doubt as to arbitrability is to be resolved in favor of arbitration." *SBC Interactive, Inc. v. Corp. Media Partners*, 714 A.2d 758, 761 (Del. 1998). Therefore, the Court concludes that Stallings's Third Counterclaim for breach of the Bylaws falls within the scope of the arbitration provision of the Bylaws and, accordingly, must be sent to arbitration.

### (3) Fourth and Fifth Counterclaims.

70. Stallings's Fourth Counterclaim contends that Local Social failed to pay Stallings wages that had accrued to Stallings at the time of his termination in violation of N.C. Gen. Stat. §§ 95-25.6 and 95-25.7. (Answer & Countercls. 18–19,

¶¶ 25–33.) Stallings's Fifth Counterclaim for conversion is based on allegations that, at the time of Stallings's termination, Plaintiffs wrongfully assumed ownership over personal property belonging to Stallings. (Answer & Countercls. 19, ¶¶ 34–39.) Stallings makes no argument as to how his Fourth or Fifth Counterclaims are disputes arising under the Bylaws. These claims neither depend on the existence of the Bylaws nor concern matters that touch on the rights or obligations thereunder. Therefore, the Court concludes that Stallings's Fourth and Fifth Counterclaims do not fall within the scope of the arbitration provision in the Bylaws.

### 2. The Shareholders' Agreement and Stock Purchase Agreement.

71. Stallings alternatively argues that, if the Court concludes that all claims are not arbitrable under the Bylaws, then Plaintiffs' First, Second, Third, Fifth, Sixth, Eighth, and Ninth Claims and Stallings's Third Counterclaim are arbitrable under the Bylaws; Plaintiffs' Fourth Claim and Stallings's Second Counterclaim are arbitrable under the Shareholders' Agreement; and Eaddy's Tenth and Eleventh Claims are arbitrable under the Stock Purchase Agreement. (Def.'s Br. Supp. 10–12.) Having discussed and determined the arbitrability of all claims under the Bylaws, the Court limits its analysis to Stallings's contentions of arbitrability under the Shareholders' Agreement and the Stock Purchase Agreement.

### a. The arbitrator is to decide issues of substantive arbitrability under the Shareholders' Agreement.

72. Stallings contends that Plaintiffs' Fourth Claim and Stallings's Second Counterclaim, both for breach of the Shareholders' Agreement, are arbitrable under

the Shareholders' Agreement. (Def.'s Br. Supp. 11−12.) As with Stallings's Motion to Compel Arbitration under the Bylaws, the Court must first determine whether the Court or the arbitrator is to decide issues of substantive arbitrability under the Shareholders' Agreement.

73. The arbitration provision in the Shareholders' Agreement provides, in relevant part:

> Except as otherwise provided for deadlocked matters in Paragraph 25 hereof, in the event of a disagreement with respect to any matter whatsoever arising under this Agreement . . . the dispute shall be referred to an arbitration committee whose decision shall be binding on all of the parties hereto without further action or recourse. . . .
>
>    . . . .
>
>    . . . Except as herein provided, the rules of the [AAA] will apply in arbitration proceedings.

(Compl. Ex. D, ¶ 23.) Plaintiffs argue that the arbitration provision's reference to the AAA rules has no bearing on this Court's determination of whether the parties intended for the arbitrator to decide issues of substantive arbitrability because the provision does not reference the "Commercial Arbitration Rules" or another specific body of rules. (Pls.' Resp. Opp'n 12.) The Court disagrees. *See Hargis*, 2012 Del. Ch. LEXIS 225, at *4, *16−17 (concluding that the second prong of *Willie Gary* was satisfied where the arbitration provision provided that "the rules then obtaining of the [AAA] will apply"); *Julian*, 2009 Del. Ch. LEXIS 164, at *18−20 (concluding that the second prong was satisfied where the arbitration provision provided that "the rules of the [AAA]" will apply); *McLaughlin*, 942 A.2d at 619, 626 (same). Thus, the

second prong of *Willie Gary* is satisfied as the arbitration provision states that the rules of the AAA will apply.

74.     The Court further concludes that the first prong of *Willie Gary*, that the agreement generally provides for arbitration of all disputes, is satisfied. The arbitration provision encompasses disagreements "with respect to any matter whatsoever arising under" the Shareholders' Agreement. The carve-out for deadlocked matters under paragraph 25 does not affect the provision's broad scope. Pursuant to paragraph 25, a shareholder vote that results in a tie is deemed deadlocked, and the chairman of the board of directors has a tie-breaking vote with respect to any deadlocked matter. (Compl. Ex. D, ¶ 25.) If the chairman elects not to vote, then paragraph 25 provides that the deadlocked matter shall be determined pursuant to the arbitration provision. (Compl. Ex. D, ¶ 25.) This limited carve-out, in conjunction with the otherwise broad scope of the arbitration provision, "does not overcome the presumption created by a reference to the AAA [r]ules in favor of having an arbitrator resolve disputes about substantive arbitrability." *Hargis*, 2012 Del. Ch. LEXIS 225, at *15 n.43.

75.     "[E]ven if the *Willie Gary* test is satisfied, a court must still make a preliminary evaluation of whether the party seeking to avoid arbitration of arbitrability has a made a clear showing that its adversary has made essentially no non-frivolous argument about substantive arbitrability." *Li*, 2013 Del. Ch. LEXIS 83, at *17 (quotation marks omitted). "[W]hen a non-frivolous argument in favor of substantive arbitrability exists and the first two prongs of *Willie Gary* are satisfied,

the Court should defer to the arbitrator." *Redeemer Comm.*, 2017 Del. Ch. LEXIS 30, at \*10 (alteration in original). Here, a non-frivolous argument exists that Plaintiffs' Fourth Claim and Stallings's Second Counterclaim for breach of the Shareholders' Agreement are arbitrable under the Shareholders' Agreement. Both claims concern rights and obligations created by the Shareholders' Agreement and, thus, arguably constitute disagreements over matters arising under the agreement. Therefore, the Court concludes that the arbitrability of Plaintiffs' Fourth Claim and Stallings's Second Counterclaim must be decided by the arbitrator.

### b. The arbitrator is to decide issues of substantive arbitrability under the Stock Purchase Agreement.

76. Stallings argues that Eaddy's Tenth Claim for enforcement of the Promissory Note and Eleventh Claim for judicial enforcement of her security interest are arbitrable under the Stock Purchase Agreement. (Def.'s Br. Supp. 12−13.) As with Stallings's claims of arbitrability under the Bylaws and the Shareholders' Agreement, the Court must first determine whether the Court or the arbitrator is to decide issues of substantive arbitrability under the Stock Purchase Agreement.

77. The arbitration provision in the Stock Purchase Agreement provides, in relevant part, that "[a]ny dispute arising under or in any way related to this Agreement shall be submitted to binding arbitration by the [AAA] in accordance with the Association's commercial rules then in effect." (Aff. Stallings Ex. A, § 8.8(b).)

78. The Court concludes that the Stock Purchase Agreement satisfies the *Willie Gary* test. The arbitration provision contains broad, unqualified language requiring arbitration of all disputes arising under or related to the Stock Purchase Agreement.

Unlike the arbitration provisions in the Bylaws and the Shareholders' Agreement, the arbitration provision in the Stock Purchase Agreement contains no carve-outs, limited or otherwise. Further, the Stock Purchase Agreement provides that the AAA's commercial rules will apply, thereby satisfying the second prong. Therefore, the arbitrability of Eaddy's Tenth and Eleventh Claims must be determined by the arbitrator unless there is no non-frivolous argument in favor of arbitrability.

79. Plaintiffs argue that Eaddy's Tenth and Eleventh Claims arise under the Promissory Note and the Security Agreement, not the Stock Purchase Agreement, and that the Stock Purchase Agreement is irrelevant to the present dispute because no party has asserted a claim under the Stock Purchase Agreement. (Pls.' Resp. Opp'n 22–23.) The arbitration provision in the Stock Purchase Agreement, however, provides for arbitration of "[a]ny dispute arising under or *in any way related to*" the Stock Purchase Agreement. Thus, that Plaintiffs' claims do not specifically or expressly arise under the Stock Purchase Agreement does not foreclose the arbitrability of these claims under the Stock Purchase Agreement.

80. The Court concludes that there is a non-frivolous argument in favor of arbitrability of Eaddy's Tenth and Eleventh Claims under the Stock Purchase Agreement. The Stock Purchase Agreement concerns Eaddy's sale of fifty shares of Local Social stock to Stallings for $125,000, and expressly states that the purchase price is to be paid via a promissory note. (Aff. Stallings Ex. A, §§ 1.1–1.2.) The Stock Purchase Agreement further provides that Stallings's obligations under the promissory note "shall be secured by a pledge" of the stock for Eaddy's benefit. (Aff.

Stallings Ex. A, § 1.2.) The Promissory Note is in the amount of $125,000—the purchase price of the stock as set forth in the Stock Purchase Agreement—and provides that it is secured by the Security Agreement covering fifty shares of Local Social stock in Stallings's name. (Compl. Ex. A, at 1–2.) The Security Agreement grants Eaddy a security interest in Stallings's fifty shares of Local Social stock—the stock sold by Eaddy to Stallings pursuant to the Stock Purchase Agreement. (Compl. Ex. B, at 1.)

81. "The Court's analysis of whether there is any non-frivolous argument is limited—a court must not delve into the scope of the arbitration clause and the details of the contract and pending lawsuit." *3850 & 3860 Colonial Blvd., LLC v. Griffin*, C.A. No. 9575-VCN, 2015 Del. Ch. LEXIS 52, at *13 (Del. Ch. Feb. 26, 2015) (quotation marks omitted). "[O]therwise a court would be deciding the first-order question of substantive arbitrability before deciding the second-order question of who decides substantive arbitrability." *Li*, 2013 Del. Ch. LEXIS 83, at *18. Based on its limited review, the Court concludes that there is a non-frivolous argument in favor of arbitrability of Eaddy's Tenth and Eleventh Claims and, as a result, the arbitrator must decide the arbitrability of these claims.

## C. Stay of Proceedings

82. The Court has determined above that some, but not necessarily all, of the claims and counterclaims must be sent to arbitration. Notwithstanding the fact that some of the claims raised by the pleadings do not appear to be subject to arbitration provisions, Stallings nonetheless requests, pursuant to N.C. Gen. Stat. § 1-569.7(g),

that the Court stay any further judicial proceedings in this action pending the outcome of arbitration. (Def.'s Br. Supp. 14); *see* 9 U.S.C. § 3 (providing for a stay of judicial proceedings pending arbitration); *Southland Corp. v. Keating*, 465 U.S. 1, 16 n.10 (1984) ("[W]e do not hold that §§ 3 and 4 of the [FAA] apply to proceedings in state courts."); *Gaylor, Inc.*, 2015 NCBC LEXIS 102, at *12 ("[E]ven when the FAA governs a dispute, state law fills procedural gaps in the FAA as it is applied in state courts, including where claims might otherwise be governed by sections 3 and 4 of the FAA." (citations and quotation marks omitted)).

83.    Section 1-569.7(g) provides that "[i]f the court orders arbitration, the court on just terms shall stay any judicial proceeding that involves a claim subject to the arbitration." N.C. Gen. Stat. § 1-569.7(g). Having concluded that Stallings's Third Counterclaim is subject to arbitration, the Court must stay the proceedings with respect to this claim, which includes Plaintiffs' Motion to Dismiss this claim. *See Fontana v. Se. Anesthesiology Consultants, P.A.*, 221 N.C. App. 582, 592, 729 S.E.2d 80, 88 (2012).

84.    Section 1-569.7(g) further provides that "[i]f a claim subject to the arbitration is severable, the court may limit the stay to that claim." N.C. Gen. Stat. § 1-569.7(g). "The trial court has broad discretion to grant or deny a request for stay in such circumstances." *Gaylor, Inc.*, 2015 NCBC LEXIS 102, at *21−22. The Court has concluded that the arbitrator must decide the arbitrability of Plaintiffs' Fourth, Tenth, and Eleventh Claims and Stallings's Second Counterclaim. Other than Stallings's Second and Third Counterclaims and Plaintiffs' Fourth, Tenth, and

Eleventh Claims, the remaining claims and counterclaims are not subject to arbitration as set forth in this Order and Opinion.

85. The Court, in its discretion, defers ruling on Defendant's request for a stay of all claims and counterclaims in this action pending the arbitrator's decision on the arbitrability of Plaintiffs' Fourth, Tenth, and Eleventh Claims and Stallings's Second Counterclaim. Upon the arbitrator's decision thereon, the Court will determine whether the non-arbitrable claims are severable and, if so, whether the stay should be limited to the arbitrable claims. The Court defers ruling on Plaintiffs' Motion to Dismiss pending the Court's determination of the scope of the stay.

86. While the Court stands ready to make a decision as to the stay request upon the arbitrator's determination of arbitrability and to proceed on all non-arbitrable claims and issues at the appropriate time, the parties retain the right, by agreement, to have an arbitrator or panel of arbitrators consider and determine all issues in this case, not just those transferred to arbitration pursuant to this Court's ruling. That decision is one the parties must make mutually and voluntarily.

## V. CONCLUSION

87. For the foregoing reasons, the Court **GRANTS in part** and **DENIES in part** Stallings's Motion to Compel Arbitration as follows:

    A. The Court **GRANTS** Stallings's Motion to Compel Arbitration and orders Stallings's Third Counterclaim to arbitration pursuant to the Bylaws, and the litigation of this claim is **STAYED** pending the outcome of arbitration.

B.   The determination of the arbitrability of Plaintiffs' Fourth Claim and Stallings's Second Counterclaim under the Shareholders' Agreement, and the determination of the arbitrability of Eaddy's Tenth and Eleventh Claims under the Stock Purchase Agreement, are **DEFERRED** to the arbitrator. The Court **DEFERS** ruling on Defendant's request for a stay as to these claims pending the arbitrator's decision on the arbitrability thereof.

C.   The Court **DENIES** Stallings's Motion to Compel Arbitration as to Plaintiffs' First, Second, Third, Fifth, Sixth, Seventh, Eighth, and Ninth Claims and Stallings's First, Fourth, and Fifth Counterclaims. The Court **DEFERS** ruling on Defendant's request for a stay as to these claims pending the arbitrator's decision on the arbitrability of Plaintiffs' Fourth, Tenth, and Eleventh Claims and Stallings's Second Counterclaim.

D.   The Court **DEFERS** ruling on Plaintiffs' Motion to Dismiss pending the Court's determination of the scope of the stay.

E.   The parties shall notify the Court of the arbitrator's decision concerning the arbitrability of Plaintiffs' Fourth, Tenth, and Eleventh Claims and Stallings's Second Counterclaim within seven days after such decision has been issued.

F.   The parties shall notify the Court of the outcome of the arbitration proceeding within seven days after the arbitrator has issued his or

her decision. The parties shall submit to the Court a copy of the arbitrator's decision accompanied by the parties' recommendations concerning further proceedings in this Court.

**SO ORDERED**, this the 9th day of October, 2017.


/s/ Michael L. Robinson
Michael L. Robinson
Special Superior Court Judge
  for Complex Business Cases